UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                    CRIMINAL NO. 18-20128

v.                                  Hon. STEPHEN J. MURPHY

D-7 CALEB YOUNG,

        Defendant.

_____/

### **Government's Sentencing Memorandum**

This is an organized crime case. Caleb Young and his fellow group members pretended to be teenage boys to gain the interest, trust, and cooperation of preteen and teenage girls. These men in their 30s and 40s psychologically manipulated their victims to get them to engage in sexual activity on web camera on an unmonitored, chatroom-based website. They hunted girls. They lied to girls. They manipulated girls. They ganged up on girls. They sexually exploited girls. And they did so repeatedly, for years, victimizing more than 100 girls (only a fraction of whom have been positively identified). Young's group was well-organized, disciplined, and experienced. Their crimes shock the conscience of even the most seasoned criminal law observer. This group did not invent the sexual exploitation of children, but they may have perfected it. This Court should sentence Young to 35 years in prison for his part in the enterprise.

# I
## STATEMENT OF FACTS: THE BORED GROUP

Earlier this year, this Court sentenced several men for their participation in a child exploitation enterprise. (*United States v. Eisley, et al.,* 17-20632). That prior group, like the group before the Court now, primarily used Website A to exploit its victims. This Court is thus familiar with Website A, which is an unmonitored, chatroom-based website that allows its users to communicate in real time through a chat function while as many as two users can appear live on web camera in a particular chatroom. Website A's display included the live web camera activity, the chat dialogue box, and a user list. It looked like this:



Any user could create a new chatroom by simply giving it a unique name. Importantly, Website A did not provide a centralized list of all of the active

chatrooms.  That meant that Website A users needed to know the precise URL (or address) of the chatroom in order to enter it.

The defendants in this case spent almost five full years on Website A creating dozens and dozens of individualized chatrooms for specific victims.  For reasons unknown, they typically included the word "bored" in the title of their chatrooms (e.g., Website A/justsobored, /borednstuff, /fuckingbored, /boredascanbe, /boredasfuk, /sooobored, etc.).  The group is therefore known as the "Bored Group."  Its history and strategy of exploitation follows.

## A. The Formation of the Bored Group

The Bored Group started around 2012 and remained active through 2017.  The men initially met on a moderated, fairly well-known social media platform called Stickam.  Stickam monitored its website for certain kinds of sexual activity.  Frustrated by this monitoring, the men moved to another website with less oversight.  That website rewarded its members with "points" every time they wrote a message to a female, went on web camera themselves to entice a female to engage in sexual activity, or played a pre-recorded video with this same objective (a concept known as "looping").  The Bored Group members excelled in this new format, earning enough points to be invited to the special "VIP" room of the website.  But just like Stickam, this website monitored for, and disallowed, underage sexual activity.

Not satisfied with VIP status on an over-18 adult pornography website, the group migrated to Website A where no one policed their activity.  As this Court knows, Website A was primarily devoted to the production of child pornography, with multiple groups of adult males using it to target 8-17 year-old children.  With the group finally landing in an unmonitored format, its members were now free to act on their sexual interest in preteen and teenage girls.

## B. The Evolution of the Bored Group

The Bored Group members wanted to do more than merely surf the various chatrooms on Website A to take advantage of other people's exploitation of children. Rather, they wanted to create their own chatrooms, groom their own victims, and trick their own girls into making child pornography videos especially for the members of their enterprise.  To do this, the men developed a strategy for identifying and recruiting victims, employed a variety of techniques to manipulate the children into engaging in sexual activity on web camera, and organized themselves on a dynamic website to keep one another up-to-date on group developments.

### 1.   Hunting

Most teenage and preteen girls would probably not strike up sexual conversations online with men in their 30s and 40s.  Knowing this, the Bored Group infiltrated various social media websites by passing themselves off as teenagers. Using fake profiles and stolen pictures of teenage boys, the men tried to identify

potential victims for the group.  The group scoured popular social media sites such as Gifyo, Periscope, YouNow, and MyLOL.com.  MyLOL was the group's primary hunting ground.   MyLOL is a website designed to facilitate teen dating, and describes itself as "the #1 teen dating site in the US, Australia, UK, and Canada." Once identified, the group attempted to draw the targeted girl's interest by commenting on an old image or video the girl posted so as to stand out from users who commented on newer images.  If the girl responded to the comment left by the group member (who she thought was a teenage boy), an invitation to a Website A chatroom would soon follow.  Given the tens of thousands of teenage and preteen girls frequenting social media websites, the enterprise's recruiting efforts were wildly successful.

The Bored Group memorialized this so-called "Hunt Strategy" in a tab on the group's central hub of activity—which was known as the Sheet and is discussed in more detail later.  The "Hunt Strategy" read as follows (note, a gif is an internet term for a short video):



*See* Exhibit B.  Importantly, the group's Hunt Strategy noted that commenting on a sexually suggestive image or video may alert the victim to the true interest of the group.  Therefore, the group's plan was to comment on more benign images or videos to mask the hunter's real intent (i.e., "you look less of a perv by not participating in the flood of hornyness on the new gif").  Likewise, by using an older, non-sexual image or video the group hoped to avoid what it called "heroes."  Heroes are fellow social media users who alert girls to the sexually exploitive nature of the group, thereby thwarting their scheme.

Hunters served as the essential first step to obtaining new victims.  One Website A user described "hunting" this way:

> A hunter chooses a website called – you can call it hunting ground if you want . . . they choose a website.  They go there . . . Low viewer counts are always ways to avoid competition with other groups.  And it can also be used as a tool for enticement and coercion.  Because if you're broadcasting, you want people to talk and interact with.  If they're not there, well, that's a tool.  Come over here.  There's people over here ready to talk to you.  And minor females, for the most part, want people to talk to and some sort of attention based on what I've seen . . . a hunter's primary job was procuring targets and minor female victims for sexual exploitation and redirecting them to a specific location created by the hunter.

*United States v. Fuller et al.*, Crim No. 16-20239, Apr. 4, 2017 Tr. T., 402-03.

## 2.  Enticing

The Hunt Strategy (and Hunters) only took the group so far.  Once the targeted victims arrived at one of the Bored Group's chatrooms on Website A, the group still needed to convince her to undress and/or masturbate on camera. That is where the "talkers" of the group took over.  "Talkers" attempt to make the girls feel comfortable in discussing a variety of subjects: school, family, sports, and, of course, sex.  The talkers often spent considerable time building a rapport with, and engendering the trust of, the group's victims.  The hope, obviously, was that the girl would so enjoy the attention and compliments of the teenage boys she recently befriended that she would engage in sexual activity on web camera when asked to do so by the talkers.

But typically the group needed to do more than just ask.  So the group employed a variety of manipulative techniques to entice the victim to undress or masturbate on camera for the group.   The most frequent types of manipulation were:

- **<u>Dares</u>:** challenging the minors to engage in certain behavior, evolving from innocuous behaviors, to removing clothing, to showing their naked bodies, to engaging in sex acts;

- **<u>Polls</u>:** running a "poll" to subtly manipulate the victim into specific activity. These polls began as votes about which members believed the girl was pretty,

cute, or had nice eyes.  Like the dares, the polls then graduated into votes about whether the victim should remove items of clothing, masturbate, or engage in other activity.  *See* Exhibit I, Group Using Polls to Target Minor;

- **Competitions:** using a "points" system, sometimes pitting one minor against another, when two potential victims were in a chatroom at the same time.  The group would have two girls get on web camera in one chatroom and give them points for taking off certain items of clothing and engaging in sexual activity. The girls could go from "Level One" to "Level Two" if they obtained enough points, then to "Level Three," and so on.  An example of the group's use of competitions is depicted below:



- **<u>Block Camera:</u>** If one group member had a particularly close relationship with a victim (known as the "handler" for that minor), that member claimed to the victim that he could prevent other people in the chatroom for seeing the victim on camera. As moderator of the chatroom, the lie went, the handler could block the victim's camera function for other users. This reduced the inhibitions of the victim and increased the chances she would engage in sexual activity. When the handler told the other group members that he was blocking the camera, they pretended that the web camera function in the chatroom went out and that they couldn't see the minor. *See* Govt. Ex. H-1 and H2, Group Uses Block Cams to Entice MV-2.

- **<u>Loops</u>**: like other groups on Website A, the Bored Group took used loops to entice minors. "Loopers" played previously recorded videos of minors actively chatting and performing sexual acts in a chatroom. The "looper" pretended to be the minor in the video and used the sexual activity displayed on camera to convince the targeted minor to engage in the same sex acts. According to one Website A user, the looper's first task was to "convince[] the girl that the loop is real . . . and there are ways to do that. Most of the younger females are ignorant of how live people really act all the time . . . and that's where the talkers come in. They keep constantly redirecting her thought process in certain ways in order for her to take the loop for granted. Most of

the younger females . . . they're not as tech savvy as the more older ones."
*United States v. Fuller et al.*, Crim No. 16-20239, Apr. 4, 2017 Tr. T., 402-
03.  Several members of the Bored Group used loops in this way.

Regardless of the technique or techniques used, the Bored Group's aim was always the same: break down the girl's defenses so that she would eventually undress and/or masturbate on web camera.

### 3.  Organizing and Communicating

Like any criminal enterprise, the Bored Group needed a central hub of information and communication so that group members knew about new victims, new chatrooms, or about what technique to use on a particular girl.  They created this hub on the website Titan Pad.  Titan Pad (which has since been discontinued) was an innocuous website that allowed multiple users to work collaboratively on a single document while discussing changes to the document via a chat function.  Titan Pad's formatting was similar to an Excel spreadsheet, with different tabs, charts, and tables.  The Bored Group thus referred to their Titan Pad platform as "the Sheet." The Sheet was private and password-protected, ensuring that the information it contained was available only to Bored Group members.  Some of the tabs from the Sheet (recovered during computer forensic examinations in this case) are attached at Exhibit B.

The Bored Group used Titan Pad in two ways.  First, the enterprise stored victim and chatroom information on the Sheet.  One of the Sheet's tabs kept track of the girls targeted by the group, including the victims' names, links to their social media accounts, and names of the chatrooms on Website A used to exploit them. That list of rooms was broken down under descriptive headings, such as: "camping rooms" (where members remained logged into the room in the event the victim returned), "regular" rooms (for new victims or victims that appear at least once per week), "non-regular but active" rooms, "hero alerts" (online identities of individuals who would tell victims that the group was not made up of fellow teenagers), and "graveyard rooms" (rooms that were "inactive for weeks").  *See* Exhibit B.

Second, the group used the Sheet's chat function to communicate with one another about the enterprise's activity.  Obviously, within the group chat, these men in their 30s and 40s no longer needed to pretend to be teenage boys.  Instead, the group had more frank, honest conversations about how best to manipulate the girls. Put another way, despite each man being two to four times the age of the victims in this case, and outnumbering the girls by a factor of about 10-to-1, the Bored Group talked about the girls behind their backs to maximize the likelihood of exploitation. In interviews with the FBI, the defendants described having the Sheet open on one internet screen and multiple chatrooms on Website A opened simultaneously on another screen.  The men used the Sheet's chat function to openly discuss whether

to institute a poll or a loop or to be more direct or harsh with a particular victim.  If the group decided to implement the block camera technique, they coordinated that technique in the group chat on the Sheet.  *See* Exhibit H.  And whenever the group successfully exploited a victim, non-present members of the group used the chat function of the Sheet to coordinate how to obtain recordings of the girls from other members.  Communicating is key to any criminal enterprise.  The Bored Group is no different.

When Titan Pad ceased operations in the spring of 2017, the group moved to a different website—known as Discord—to continue the group chat.  The group's leader, Christian Maire, deleted the content of the Sheet and created a new group chat on Discord.  Soon after the group reorganized on Discord, Arthur Simpatico linked the group to an online news article about the arrest of an unrelated Website A user.  This article named Website A and noted that authorities had access to the login data from Website A.  Worried about their own potential arrests, several members of the Bored Group stopped coming to Website A and no longer appeared in the group chat.  What the group did not know, however, was that the FBI's investigation into the group had already been underway for months prior to that article.

## C. The Demise of the Bored Group

In November 2015, the FBI Detroit arrested a local child pornography suspect as part of a nationwide operation.  The investigation into this offender led to the

discovery of Website A and the myriad of groups using Website A to sexually exploit preteen and teenage girls.  The investigation that followed uncovered several child exploitation enterprises operating on Website A.

Thus far, the FBI has successfully identified, located, arrested, and convicted four groups of men who used Website A to prey on children.  Like the other groups before them, members of the Bored Group were identified through IP login information and reviews of the content of social media accounts.  The Bored Group investigation also involved victim interviews, search warrant executions at group members' homes, and the forensic review of electronic devices seized from the defendants.

The following table provides a summary of the investigation as to each group member, including their role, activity, and recommended sentence:

| | Role(s) | Activity | Contact w/Victims | Sent Rec: |
|---|---|---|---|---|
| Christian Maire, 40 years old, (known as James, Spacey, Spaceyjames, Spaceman) | **Leader** of the group; **Handler**; **Hunter**; **Talker** | • Identified by every other group member as the group leader; • Member from 2010 through May 2018; • Organized the group's website, invited members, posted social media of each targeted minor; • Found almost all the victims for the group from 2015 to 2018; • On Website A daily through May of 2018; • Used VPN to avoid law enforcement detection | • Primary point-of-contact for most minor victims to the group • Communicated with dozens of minors using fake social media profile for months and even years • Knew MV-3 was suicidal and knew others were depressed | Life |

| | | | | |
|---|---|---|---|---|
| | | • Distributed videos he recorded/produced of group victims | | |
| Arthur Simpatico, 47 years old, (known as Deff, Yab, Fred) | **Admin privileges** (one of the leaders); **Talker** | • Warned others about law enforcement investigation, leading to destruction of evidence <br> • Member from 2012-SW execution in 2018 <br> • Joined a second group in 2017 <br> • On Website A or Website B daily <br> • Distributed videos he recorded/produced of group victims <br> • Technologically sophisticated: used encryption to avoid law enforcement detection <br> • Attempted to encrypt devices as law enforcement entered home | • Knew MV-2's location and talked about taking her to a hotel when he visited her hometown; <br> • Aggressive/violent: visited chatrooms "cryingandfuck," "cryingandwin," and "punishment" <br> • Encouraged MVs to produce bestiality ("dogwin") and an "anal sharpie show" | 50 years |
| Odell Ortega, 37 years old, (known as Crazy, Crazyfish) | **Talker** | • Member from 2010 through the spring of 2017; <br> • On Website A or Website B daily; <br> • Recorded everything every time he was online – 1,278 hours of CP, 439,773 files that are child exploitive or child pornography <br> • Meticulously organized recordings with folders with each victim's true name, location, age, etc. and collected this information about each of them | • Met up with MV-10 in person by flying her out to Florida at or shortly after she turned 18; <br> • Purchased lingerie for MV-21; <br> • Paid MV-18 to produce child pornography | 50 years |
| Jonathan Rodriguez, 37 years old, (known as JWalks, Wes) | **Talker; Hunter; Handler** | • One of the most "aggressive" talkers; <br> • Went on true web cam to entice minors; <br> • Member from 2012 through SW execution date Oct. 2017; | • Had girls that the group identified as "his" [Jwalks girl; Jwalks friend]; <br> • Aggressive/violent tastes: visited "cryingandfun" chatroom, a chatroom | 40 years |

| | | | | |
|---|---|---|---|---|
| | | • Created fake social media profile to entice minors to engage in sexual activity (including MV-1 and MV-2) | known to be associated with blackmailing minors, and a chatroom where MV-12 routinely cut herself while engaging in sexual activity on web cam | |
| Brett Sinta, 36 years old, (known as Tex, Tex.Ass.2) | **Hunter; Moderator; Talker** | • Organized the "polls" the group would give to minors to entice them to engage in sexual activity; <br> • Was the moderator of certain chatrooms; <br> • Member from 2010 to May of 2017 (when group was warned by Simpatico); <br> • Drilled holes through hard drives at around the time Simpatico warned the group about law enforcement's discovery of Website A <br> • Created fake social media profile to entice minors to engage in sexual activity | • Carried on one-on-one relationships with certain minors, including MV-5 and MV-6, enticing them to send sexually explicit images and pretending to be a teenage boy; <br> • MV-5 believed he was her boyfriend and they carried on a relationship for a year. | 40 years |
| Daniel Walton, 34 years old, (known as Smoke) | **Talker** | • Member from 2012 through the summer of 2017; <br> • On Website A or Website B daily; <br> • Recorded everything every time he was online – 241 hours of CP, 15,951 files that are child exploitive or child pornography; <br> • Distributed the recordings he made to other group members; <br> • Created fake social media profile to entice minors to engage in sexual activity | • Targeted at least 11 victims one-on-one, enticing them to engage in sexual activity and sometimes engaging in sexual activity himself on web cam with them to get them to do so <br> • Knew that these victims were vulnerable (one had a father who was molesting her and a sister who had been killed) | 35 years |

| Michal Figura, 36 years old, (known as Sid, Woot, Sammie, Freddie) | Talker | • Member from 2012 through at least the month prior to the Oct. 2017 SW;<br>• On Website A or Website B multiple times a week – 6,122 visits to just Website A during the time period covered by the logs;<br>• Technologically sophisticated: IT specialist taught other members how to stream videos from You Now and how to download videos that the You Now moderators had removed due to their illicit content | Aggressive/violent tastes: visited chatrooms "blackmailcapper," "cryingandfun," and "fuckmeharder" | 35 years |
|---|---|---|---|---|
| Caleb Young, 38 years old, (known as JohnB) | Talker; Hunter | • Member from 2012 through the spring of 2017;<br>• On Website A or Website B daily;<br>• Created a fake social media profile pretending to be a teenager to entice minors;<br>• Discarded a 2 TB hard drive right around the same time period as Simpatico warned the group (May of 2017) about law enforcement's investigation | Visited chatroom "cryingandfun" | 35 years |

## II
## STATEMENT OF FACTS: THE VICTIMS

As indicated above, the Bored Group left monitored websites for the specific purpose of targeting and sexually exploiting underage girls. The group communicated the ages of its victims using a "minus" (-) sign in relation to 18 years of age. Thus, a 16 year-old girl was "-2", 15 year-old girl "-3", 14 year-old girl "-4", etc. The group's target age range was 13-17 years old. But the group victimized a girl as young as 10. Defendant Odell Ortega had a video of this now-identified girl saved on his computer. During the video, the 10 year-old girl masturbated while staring into the web camera and chatting on Website A.

Beyond the vulnerability of being children surrounded by adult men in a chatroom on the internet, many of the group's victims had particularized vulnerabilities. Not surprisingly, the Bored Group had a plan for such vulnerable victims. And that plan was not to leave them alone. If a girl was suicidal or revealed that she was cutting herself, the group engaged in what they called a "trust building session." Trust building sessions involved no discussion of sexual activity, but rather more sensitive chats about life and the child's worth. To be sure, there was no benevolence in these sessions. Instead, the group used trust building as an opportunity to further engender loyalty to the group so as to increase the chances that the girl would later engage in sexual activity on web camera. Examples of the group using "trust building" include the following:

- The group targeted an approximately 15-year-old girl (MV-44) who disclosed that she had previously been committed to a psychiatric ward, she was currently in therapy, and that she was cutting and burning herself (*See* Exhibit D-1, Trust Building Example);

- The group targeted a then 15-year-old girl (MV-9) who told them she had an addiction to self-harm (*See* Exhibit D-2);

- The group targeted MV-9 who started cutting herself while they were talking together, even showing the group her cuts (*See* Exhibit D-3);

- The group targeted an approximately 15-year-old girl (MV-13) who they know has a mother who is a drug addict (*See* Exhibit E);

- The group again targeted MV-13 who cried during the enticement (Exhibit F).

Most of the Bored Group members reported that girls they targeted were cutting or suicidal. One said that about half of the girls cut themselves, another said girls "commonly" engaged in this behavior, and yet another confirmed these statements and recalled one particular victim cutting herself live on web camera. These same group members explained how this vulnerability created an opportunity for them to engage in the "trust building" described above so that they could more successfully entice these minors to undress or masturbate on camera for the group.

In all, the Bored Group victimized hundreds of girls.  The FBI has identified only a few dozen of them so far.  Some will never be identified and never obtain the help that they need.  Others have been identified, interviewed, and provided heart wrenching victim impact statements to the court (*see* Exhibit A, Victim Impact Statements), or will appear at sentencing to address the Court.  Each girl's story tells the tale of manipulation and exploitation.  Each girl's story tries to put the unimaginable abuse into words.  Each girl's story speaks not only for the author, but for the dozens of other girls who will not have the opportunity to address the Court.

For example, this past year, MV-17, victimized at the age of 13 or 14 by the group, attempted suicide by trying to cut herself with glass.  She also hit a brick wall, injuring her hand.  She cut her arms for years, and this behavior has only subsided during the past few months with the help of intensive therapy.  MV-17 plans to attend sentencing with the supervisor of the facility where she is staying.

MV-12, who was one of the victims that cut herself live on web camera on Website A, is currently committed to a hospital and has struggled immensely.  She was recently in a car accident that rendered her a paraplegic.  She now has a court-appointed guardian.

MV-10 suffers from post-traumatic stress disorder and has a service dog to assist her.  *See* Exhibit A-10.  MV-19, who was targeted on Website A starting at age 11, struggles with depression and has been seeing a therapist for over a year.

She also struggles with cutting.  She has a permanent therapy dog for which the family must make monthly payments.  MV-16, who was approximately 14 years old when the group targeted her, struggles with cutting as well and is in therapy.  Her and her mom recently moved because of concerns for her safety in light of the conduct on Website A.  MV-18, who was 16 when she was targeted, moved schools and residences.  *See* Exhibit A-18. [1]

MV-1, who was 14 when first targeted, has been in extensive therapy.  Her father explained that this incident has led to feelings of guilt and has impacted the whole family.  MV-21, who is now 19, said that she remains terrified to leave her home.  *See* Exhibit A-21.  Other victims or their parents could write similar letters about the destructive results the Bored Group's actions have had on their families.  Some parents will attend the sentencing hearing, others can't bear to.  The victims all paid a cost for having the misfortune of crossing paths with the well-organized, determined, and sexually perverse group of men now before the Court.

While every victim's story is important, the letter from the mother of MV-2—the girl most frequently victimized by the group—deserves special consideration.  MV-2 was an elite dancer who attended the finest ballet school in Canada.  Her mother describes her as "a sensitive kid, she was precocious, intelligent, and an excellent student."  But as a teenager, MV-2 suffered from anxiety about performing

---

[1]  MV-16, MV-17, MV-18, and MV-21 all plan to attend sentencing.

well and felt isolated and lonely.  She sought friendships online, including with the members of the Bored Group.  As her mother put it, the results of those relationships were "worse than anything we could have imagined."  MV-2 was sexually exploited by the group for years.  They manipulated and enticed her into creating more than 60 videos or herself engaged in sexual activity.  Behind her back, the group both praised her for doing what they said and mocked her for being so easy to coerce.

Eventually, the FBI's investigation led Canadian authorities to identify MV-2.  MV-2's mother noted that by the time the authorities arrived at their home, the family already felt the repercussions of MV-2's exploitation:

> the depression and anxiety had already kicked in.  She missed an entire year of academic school and had to come home from the elite ballet school she had finally made it into in order to deal with her mental health.  It took months, medication, and sleep in order to deal with the self-loathing that was creeping into her subconscious.  She couldn't do her school work, lost touch with her friends, and her dance dreams died.  She was completely derailed, and we had no idea why.  This has taken years from her.  Years.  I know we were precariously close [] to losing her.  This could have been a very different letter.

*See* Exhibit A-2.

# III
## STATEMENT OF FACTS: YOUNG'S CONDUCT

Caleb Young participated in the manipulation and sexual exploitation of dozens of girls.  (PSR ¶ 33).  Victims and other Bored Group members knew Young as JohnB.  He was a hunter and talker for the group.  (PSR ¶ 31).  Young spent considerable time on Website A.  By his own estimation, Young visited the site 3-4 times each week.  (PSR ¶ 31).  Login data obtained from Website A showed that in just over three weeks (from March 1, 2017, to March 25, 2017), Young logged into chatrooms on Website A more than 800 times.  (PSR ¶ 25).

On October 31, 2017, the FBI executed a search warrant at Young's home in Olmsted Falls, Ohio.  The FBI recovered two laptops (a Macbook Pro and an HP laptop) and an iPhone.  They also interviewed Young.  Young admitted to visiting Website A and Discord, but denied being JohnB or accessing child pornography in the chatrooms on Website A.  Young even claimed that he would leave a chatroom on Website A if he suspected the girl in the chatroom was underage.

In a subsequent interview, however, Young admitted his conduct more fully. Young acknowledged being JohnB, serving as a hunter and talker for the group, and to recording videos of some of the group's victims.  Young also acknowledged that the group migrated to Website A from other websites with the specific intent of targeting minors.  As to being a hunter, Young acknowledged creating and using a profile on MyLOL.com (the teenage dating website described earlier).  Just as on

Website A, Young pretended to be a teenage boy on his MyLOL profile.  Finally, as it related to victims, Young recalled at least one girl cutting herself while on camera with the group.  (PSR ¶ 25).

The forensic review of Young's computers revealed 7 child pornography videos.  Young told the FBI, however, that he had thrown away a 2TB external hard drive close in time to the search.  Young claimed the device had stopped working. The FBI has not recovered that external hard drive.  To be sure, Young received many more videos of child pornography than those recovered from his devices.  He would just delete those videos after viewing them.  (PSR ¶ 30).

Young appeared regularly in the group's Discord chat (spanning April 30, 2017-August 2017).  During this time, Young provided the group with links to three potential victims, including a recording of one victim exposing herself.  He wrote, "[she] did flash but shitty cam."  As a talker, moreover, Young participated in several chats with victims.  After the group successfully enticed one child to engage in sexual activity, Young asked her, "did you cum?"  When she said yes, Young wrote "I bet you could do it again in a few min."  He also said, "I think that bra needs to come off…you gonna take it off for me or do I have to come do it myself?"  *See* Exhibit C.  Young also helped target MV-2, the group's most frequently victimized girl whose mother's victim impact statement is referenced above.  When Bored Group leader Christian Maire told other group members in a private chat that MV-2

was coming to a chatroom on Website A, Young said, "ok I can talk for a bit." Young apparently did not like what MV-2 wanted to discuss, as he told the group, "ok gotta get her away from thinking family/friends and thinking about other stuff." Soon thereafter, Young later left the chat but MV-2 was victimized that night by other group members. *See* Exhibit H.

## IV
## PROCEDURAL HISTORY

In February 2018, a federal grand jury returned a ten-count indictment against nine members of the Bored Group, including Young. Each Defendant was charged as a member of a child exploitation enterprise ("CEE"), along with several other child sexual exploitation offenses. All nine have pleaded guilty to the CEE charge. (PSR ¶¶ 6-8).

# V
## SENTENCING FACTORS, TITLE 18 U.S.C. § 3553

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution.

The most relevant factors are evaluated below, beginning with number 4, the sentencing guidelines.

### A. The Advisory Guideline Range

In *United States v. Rita*, 551 U.S. 338 (2007), the Supreme Court restated that the goals of the United States Sentencing Commission in formulating the Sentencing Guidelines are to carry out the objectives of 18 U.S.C. § 3553(a). Despite being advisory, rather than mandatory, the Guidelines remain an important factor in fashioning a just sentence. As the Supreme Court stated in *Rita*, "it is fair to assume

that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id.* at 345.

In *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008), the Court in analyzing the holding in *Rita*, recognized that the guidelines represent the Sentencing Commission's attempt to reconcile the factors under § 3553(a), that these factors seek to balance Congress' competing interests in consistency, and that a confluence between the national views of the sentencing commission and the independent views of a sentencing judge results in a "double determination" which significantly increases the likelihood that a sentence is reasonable.

In *United States v. Gall*, 128 S.Ct. 586, 601 (2007), the United States Supreme Court provided a template for sentencing proceedings in the district court. The Court held that a district court should begin sentencing proceedings by correctly calculating the applicable guidelines. *Gall*, 128 S.Ct. at 596.

The Guidelines in this case are not in dispute. The parties agree that Young is a criminal history category I with an offense level 43, resulting in a Guidelines range of life imprisonment. (PSR ¶ 86).

## B. Nature and Circumstances of the Offense

The nature and circumstances of the offense warrant the Government's requested 35-year sentence here. Young participated in an international, multi-year child exploitation enterprise. The crimes of Young and his cohorts involved the

coordinated manipulation and exploitation of more than 100 preteen and teenage girls.  The enterprise targeted children as young as 10 years old and used a variety of manipulative techniques—such as polling, block camera, and looping—in their attacks on these children.

As for Young's conduct in particular, he was a member of the group from its inception.  Young admitted to migrating to Website A from other, more closely monitored platforms for the express purpose of sexually exploiting underage girls.  Young served as a part-time hunter and talker for the group.  In the Discord chats covering late April to August 2017, Young linked three potential victims to other group members.  According to Website A login data, moreover, Young accessed more than 800 chatrooms on Website A in the short period from March 1, 2017, to March 25, 2017.  (PSR ¶ 25).  Such frequency demonstrates how important the group's activity on Website A was for Young.

Young's comments as a talker demonstrated his callousness towards the group's victims.  When MV-2—the troubled ballet dancer frequently exploited by the enterprise—talked about family and friends with the group, Young wrote to his co-defendants, "ok gotta get her away from thinking family/friends and thinking about other stuff."  *See* Exhibit H.  To other victims, Young was direct and to the point: telling one girl to take off her bra and challenging her to "cum" again a few minutes after she masturbated on camera for the group.  *See* Exhibit C.

Finally, Young recorded some of the girls on Website A.  Young kept 7 child pornography videos on the electronic devices seized by the FBI during the search warrant at his home.  Young accessed hundreds more videos of child pornography.

Thus, the nature and circumstances of the offense justify the proposed 35-year prison sentence for Young.

### C. History and Characteristics of the Offender

Young's history and characteristics provide no basis for a sentencing break. Young grew up in a loving, tight knit home.  Young suffered no abuse as a child. His family continues to support and love him even after his arrest and conviction. (PSR ¶¶ 60-67).  Young has no serious medical problems, and denies any mental health or substance abuse issues.  (PSR ¶¶ 68-76).  Prior to his arrest, Young maintained steady employment, but appeared to have no significant hobbies or activities beyond his participation in this remarkable child sexual exploitation enterprise.  (PSR ¶¶ 80-83).

### D. The Sentence Imposed Must Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

The purposes of sentencing call for a 35-year sentence here.  The offense of child exploitation enterprise is incredibly serious as it involves multiple defendants working together to sexually exploit multiple victims.  Congress identified the seriousness of child exploitation enterprises when it set the minimum penalty at 20

years, which is the highest minimum punishment set forth in federal law for first-time, non-homicide offenses. *See* 18 U.S.C. § 2252A(g)(1).

The seriousness of the Bored Group's conduct, however, surpasses even the typical child exploitation enterprise. Young and his cohorts produced hundreds of child pornography videos of their more than 100 victims. Despite targeting preteen and teenage girls, every group member (except Defendant Daniel Walton) was in his 30s or 40s. But merely taking advantage of the significant intelligence and life experience differences between these men and their victims was not enough for this group. Rather, they stacked the deck against the victims even further by working together against the unsuspecting children in a coordinated attack. These girls unknowingly stepped into a lion's den by simply posting pictures or short videos to regular teenage social media websites. As MV-2's mother said about girls seeking friendships on the internet and meeting this well-organized gang of exploiters: "the result was worse than anything we could have ever imagined." *See* Exhibit A.

This group has normalized sexual behavior that is completely abnormal. They have robbed these young minor girls, some as young as ten-years old, of their innocence. They have taught them that they are only special and will only get attention and "fit in" with others their age if they are willing to let others exploit their bodies. For those that have been identified, hopefully their parents are able to help bring healing and restore them day by day. But, for those that are not identified,

there is no telling what damage Young's group has done, and whether they will ever be able to live productive, healthy lives.

To promote respect for the law, a sentence far above the mandatory minimum must be imposed.  Adequate punishment here—which in this case is difficult to quantify—should be measured in terms of decades, not years, in prison.

### E. Deterrence

A significant prison sentence for Young will send a general deterrence message to other, like-minded individuals.  Because the Internet allows users to maintain anonymity, an offender need only have recording software and knowledge of an unmonitored website to do what this group did.  Recording software is now available free on the internet with just the click of a button.  Thus, deterrence in these types of cases is of incredible importance.  Potential offenders who think about doing what this group did, which has left permanent scars on so many young girls, should know that, if they are caught, they will likely spend the rest of their lives in prison.

Specific deterrence of Young is likewise important.  While Young was not one of the leaders of the Bored Group, he was a regular participant from the beginning of this enterprise.  Young hunted.  Young enticed.  Young recorded.  Young manipulated.  Young lied.  Some of Young's family members suggest that Young "made mistakes" as part of this offense.  But this was no mistake.  Nothing Young did to these children happened by accident.  Instead, for years he woke up

every morning and went to sleep every night knowing that he was part of a group that committed horrendous crimes against children. The public deserves to be protected from a person capable of this kind of repeated exploitation of the most vulnerable victims.

### F. Avoiding Unwarranted Sentence Disparities

A sentence of 35 years also avoids unwarranted sentencing disparities. Young was not the least, nor most, culpable offender in this group. The government's recommendation takes into consideration what Young did (hunting, talking, recording), how long he did it (from the group's inception), how frequently he did it (often), and the scope of the damage caused (immeasurable). Balancing all of these considerations justifies a sentence of 35 years in custody for Caleb Young.

## VI
## RESTITUTION STIPULATION

The parties stipulated to a restitution amount of $5,000 per identified victim of the offense. The parties have prepared a restitution stipulation for the 24 identified victims in the Bored Group. The money shall be paid by the Defendant to the Clerk's Office, who will then make payments to the parents of the victims or the victims (if they are 18 at the time of sentencing).

# VII
# CONCLUSION

The Court should sentence Caleb Young to 35 years' imprisonment followed by 10 years of supervised release.


Respectfully submitted,

Matthew Schneider
United States Attorney

s/Kevin M. Mulcahy
Kevin M. Mulcahy
April N. Russo
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9713
E-Mail: Kevin.Mulcahy@usdoj.gov


Dated:  November 28, 2018

## Certificate of Service

I hereby certify that on November 28, 2018, I electronically filed the Government's Sentencing Memorandum for the United States.  I also filed the Exhibits under seal with the Clerk of the Court of the Eastern District of Michigan. I sent the memorandum and attached exhibits via Fed-Ex to defense attorney Andrew Stacer.

Andrew Stacer
*Attorney for Defendant*

s/Kevin M. Mulcahy
Kevin M. Mulcahy
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9713
E-Mail: Kevin.Mulcahy@usdoj.gov